Christopher CARNEY, Individually and as Guardian Ad Litem of Lauren Carney, a minor, and Lauren Carney, Plaintiffs,

v.

Helen D. PRESTON, Defendant.

C.A. No. 94C–07–117–WTQ.

Superior Court of Delaware, New Castle County.

Submitted: June 10, 1996.
Decided: Aug. 1, 1996.

**48**

Barbara J. Gadbois, Borin & McDonald, P.A., Wilmington, and Joseph D. Regan, Donahue & Donahue, Lowell, Massachusetts, for Plaintiffs.

Stephen P. Casarino, Casarino Christman & Shalk, Wilmington, for Defendant.

## OPINION AND ORDER

QUILLEN, Judge:

Liability in this case is admitted. The jury returned a verdict of $14,000. It would surprise the Court if there was anyone in the courtroom at the time the verdict was rendered who was not shocked by the inadequacy of the amount. The Court will therefore not at this point review the injuries arising from the automobile accident, which included some permanent facial scarring suffered by a then thirteen year old girl. The low award is so grossly out of proportion to the injuries suffered as to shock the Court's conscience and sense of justice. The low dollar amount of the verdict must therefore be set aside. *Mills v. Telenczak,* Del.Supr., 345 A.2d 424, 426 (1975); *DiGioia v. Schetrompf,* Del.Super., 251 A.2d 569, 570–71 (1969); *see also Storey v. Camper,* Del.Supr., 401 A.2d 458, 464, n. 6 (1979). The Court finds the verdict inadequate as a matter of law. The main purpose of this opinion is to justify the use of additur.

The case has some other features which were raised by counsel in the case post-trial and therefore must be dealt with specifically and which may even be generally worthy of passing comment because they relate to the litigation process as faced by a trial judge. My critical remarks on these isolated matters should not suggest the case was not well tried. Indeed, in my view, the case was well tried.

█ Notwithstanding the above conclusion about the inadequacy of the damages award, the Court finds merit in the closing argument for the defendant that there were two cases before the jury, "Lauren's case and the litigation case." I do not find that argument objectionable or improper as the plaintiffs claim. Lauren Carney is doing fine. She is a lovely young lady, physically attractive and mentally alert, living a full life academically, athletically, and socially. The idea she lives in a harmful repressive state of denial because she does not want to talk about the accident, a very unfortunate experience in her life, is certainly one a jury is free to reject. I suppose most people live in a state of denial about something—death, for instance. Lauren Carney's controlled outlook

may well for her be a sign of health. She is too busy with her life to dwell on a horrible experience in an automobile accident. It may be better, as the jury verdict suggests, for family and professionals to treat her like the young adult she is, including respecting her judgment on revisiting the accident and her judgment on future medical treatment. Everyone has advantages and disadvantages; Lauren Carney is taking advantage of her abundant advantages and dealing with her relatively few disadvantages, both very well.

██ Nor is the Court impressed with the argument that defense counsel's closing remarks constituted fatal error. Obviously the jury has a duty to be fair to the defendant and that was the main point being made. But the remarks about burdens suffered by the defendant were perhaps borderline. Trials, however, are not perfect and plaintiffs' counsel's objection after the conclusion of the defense argument, if sustained, would have prejudicially affected the dynamics of the trial. No one likes interruptions of argument, but, if an objection is going to be made, interruption may be the least prejudicial because it permits adjustment. Had the plaintiffs prevailed on their request after the defense argument and before rebuttal, the defense argument would have ended with a ruling of reprimand from the bench. That unfairness would have loaded the deck in plaintiffs' favor and dwarfed any claimed prejudice to the plaintiffs from the defense argument. Plaintiffs' counsel did not even bother to rebut the remarks, although it would have been easy to do so. This Court is not impressed by a post-argument claim of error to an argument which plaintiffs' counsel chose not to interrupt and to let lie without answer. I make that statement knowing full well how such claims can be grasped on appeal. But it is a trial tactic that this Judge for one would like to discourage.

██ The Court does find the unfortunate remarks by defense counsel about the guardian's personal role in pursuing the litigation were not supported by any evidence. The Court attempted, perhaps belatedly and inadequately, to cure that error. But each side had its say, and the Court did rule, and I

doubt if the defense counsel remarks had any weight. But just to be clear of my view, nothing that happened at trial justified the conclusion that Lauren's parents were not united in their love for Lauren and were not pursuing wholeheartedly their view of Lauren's best interest. Any suggestion to the contrary was a low blow by the defense. But, on balance, I think the blow was dealt with in a manner that made prejudice unlikely.

██ In the briefing to overturn the verdict, the plaintiff improperly mentioned the offer of judgment in this case. Settlement offers are irrelevant. The insurer here met its responsibilities in a most professional fashion. It would be ironic if such responsible action were held against the defendant and her insurer post-trial. *Hartnett v. Romspert*, Del.Super., C.A. No. 93C–01–024–WTQ, Quillen, J. (Dec. 12, 1995). The use of settlement offers and offers of judgment to further a post-trial motion to set aside a verdict as inadequate is, in my judgment, highly improper.

I return now to the main issue at hand, legally inadequate damages and a request for additur. The plaintiffs' motion is for additur or a new trial. Although the defendant does not concede the award should be considered so low as to shock the conscience of the Court, defendant has suggested, if the Court finds otherwise, additur would be more appropriate than compelling a new trial.

██ There is little written about either remittitur or additur in our jurisprudence. Additur in a personal injury situation is a relatively new process in our State. The additur innovation is in sharp contrast to the practice of remittitur, which has a long history in our State. *See* authorities collected in *Burns v. Delaware Coca–Cola Bottling Co.*, Del.Super., 224 A.2d 255, 259 (1966). Indeed, although Judge Wooley recognized legal inadequacy of damages as a "good ground for which to grant a new trial," he wrote in 1906 that "there [was] no case in this jurisdiction in which the court has granted a new trial, because the damages were too small." 1 VICTOR B. WOOLEY, WOOLEY ON DELAWARE PRACTICE § 736 (1985). Soon

thereafter, this Court filled the gap noted by Wooley in *Fulmele v. Forrest,* Del.Super., 86 A. 733, 736 (1913), saying "[w]here a verdict is grossly inadequate, ... the same legal principles govern in an application for a new trial, as where the damages awarded are grossly excessive." *See also DiGioia v. Schetrompf,* 251 A.2d at 570–71 and cases cited therein. Additur was later to arrive on the Delaware scene.

But, with regard to additur, the same principles as remittitur astonishingly do not apply in the federal courts. As Judge Herlihy recently noted, the United States Supreme Court over sixty years ago decided that the Seventh Amendment to the United States Constitution forbade federal courts from granting additur. *Dimick v. Schiedt,* 293 U.S. 474, 55 S.Ct. 296, 79 L.Ed. 603 (1935); *Bacon v. Thomas,* Del.Super., C.A. No. 94C-08–213–JOH, Herlihy, J., 1996 WL 527224 (July 9, 1996). The Seventh Amendment reads:

> In Suits at common law, where the value in controversy shall exceed twenty dollars, the right of trial by jury shall be preserved, and no fact tried by a jury, shall be otherwise reexamined in any Court of the United States, than according to the rules of the common law.

As will be discussed, *infra,* the *Dimick* decision is controversial but it has survived as the law governing the federal courts. Some states, however, permit additur and Delaware is now among them. It does not seem to me, given the almost identical jury trial issue arises in a State context and the primacy of the issue, that *Dimick* can simply be ignored. I am aware of no Delaware case that discusses either additur or remittitur in connection with the litigants' constitutional right to a jury trial in civil cases. But our law seems as decisively clear as it is analytically thin. Our Supreme Court clearly held in *Moore v. Neal,* Del.Supr., No. 363, 1982, at 3–4, Christie, C.J., 474 A.2d 141 (Oct. 17, 1983) (ORDER) that "the decision of the Superior Court is REVERSED and the case is REMANDED with instructions to designate an appropriate additur and with further instructions to conduct a new trial on the issue of damages ... if appellee is unwilling

to agree to the additur." From these trenches, the Supreme Court's recognition of the role of the Trial Judge in Delaware is much appreciated; it is perhaps no coincidence that the author of the Order served on this Court for twenty-six years.

This Court, in cases involving unliquidated damages, has granted additur several times. *See Breeding v. Johnston,* Del.Super., C.A. No. 91C–02–195, Taylor, J., 1992 WL 148005 (June 10, 1992) (jury verdict $45,000; additur verdict designated $75,000); *Bowles v. White Oak, Inc.,* Del.Super., C.A. No. 86C–AP–107, Babiarz, J., 1992 WL 19936 (Jan. 31, 1992) (jury verdict $17,350; additur verdict designated $22,500—both before comparative negligence applied); *Cerroni v. Walls,* Del.Super., C.A. No. 83C–MY–20, Taylor, J., 1986 WL 6599 (May 8, 1986) (jury verdict $7,000; additur verdict designated $15,000); *Battle v. Mercier,* Del.Super., C.A. No. 84C–FE–91, Taylor, J., 1986 WL 4863 (Apr. 16, 1986) (jury verdict $1,000; additur verdict designated $5,000; *see also Lawrence v. Staite,* Del.Supr., 253 A.2d 506 (1969) (wherein additur granted by the trial court was rejected). I feel confident that there have been other instances now buried in the Archives, but I have not found a case which deals with the validity of the practice in light of the right of jury trial in the State Constitution.

Of course, additur can also be used in cases involving undisputed liquidated damages where the jury ignores an item that the Court could allow as a matter of law on unrebutted evidence. *Holland v. Sterling,* Del.Super., C.A. No. 87C–NO–132, Babiarz, J., 1989 WL 135727 (Oct. 17, 1989). This situation can arise where the jury finds for the plaintiff and refuses to include interest to which the plaintiff is entitled as a matter of law. *Superior Tube Co. v. Delaware Aircraft Indus.,* D.Del., 60 F.Supp. 573, 575, n. 5 (1945); *Stentor Elec. Mfg. Co. v. Klaxon,* 3d Cir., 125 F.2d 820, 825 (1942). Similarly, in *Rudnick v. Jacobs,* Del.Supr., 197 A. 381 (1938), a very distinguished panel of five judges, headed by Chancellor Josiah Wolcott, constituting the former Supreme Court, upheld an additur for unquestioned liquidated damages in a negligence case.

The *Rudnick* case is interesting because Chancellor Wolcott distinguishes *Dimick* since "the damages claimed [in *Dimick*] were in an unliquidated amount for personal injury, pain and suffering." *Id.* at 383. While the Court expressed no disapproval of the new trial route when unliquidated damages were at issue, noting *Campbell v. Brandenburger*, Del.Super., 162 A. 354 (1932), the tone of the Court's opinion with regard to *Dimick* is worthy of note. *Id.* at 385. The Court describes additur as the "converse" of remittitur, talks of *Dimick* "refus[ing] to apply the logic of the remittitur to the case of additur," and describes "the minority of four justices, speaking through Mr. Justice Stone in an able and forceful opinion...." *Id.* at 383. One suspects the Chancellor was making a statement.

The *Dimick* opinion itself is far from satisfactory in terms of legal rationale. In the first place, it is a five to four decision, pitting the famed conservative four horsemen and Justice Owen J. Roberts against Chief Justice Charles Evans Hughes and Justices Louis D. Brandeis, Harlan Fiske Stone, and Benjamin N. Cardozo. Secondly, the majority opinion, written by Justice George Sutherland, indicates that the well-established practice of remittitur might have been rejected as well if the 1935 United States Supreme Court majority was facing the remittitur issue as one of first impression. *Dimick*, 293 U.S. at 494, 55 S.Ct. at 304.

Third, since the Court majority viewed the additur question as whether "a doubtful [remittitur] precedent [should be] extended by mere analogy," the Court was forced to come up with a reason which grudgingly permitted remittitur while condemning additur. The majority, in affirming the Circuit Court of Appeals, *Schiedt v. Dimick*, 1st Cir., 70 F.2d 558, 562 (1934), elaborated on a somewhat metaphysical concept wherein a jury verdict, a human judgment, is transformed into a quantitative and divisible physical object for analysis. Thus, Justice Sutherland wrote at 293 U.S. at 486, 55 S.Ct. at 301:

> Where a verdict is excessive, the practice of substituting a remission of the excess for a new trial is not without plausible support in the view that what remains is included in the verdict along with the unlawful excess—in that since that it has been found by the jury—and that the remittitur has the effect of merely lopping off an excrescence. But, where the verdict is too small, an increase by the court is a bald addition of something which in no sense can be said to be included in the verdict.

*See also Belt v. Lawes*, L.R., 12 Q.B.D. 356, 358 (1884) (Opinion of Brett, M.R.).

By the inclusion of the above "excrescence" rationale, the Court confused physical science with the art of judging and diluted its strongest argument, ironically made well in the same paragraph if the unpersuasive forced rationalization is simply deleted.

> The controlling distinction between the power of the court and that of the jury is that the former is the power to determine the law and the latter to determine the facts. In dealing with questions like the one now under consideration, that distinction must be borne steadily in mind. Where the verdict returned by a jury is palpably and grossly inadequate or excessive, it should not be permitted to stand; but, in that event, both parties remain entitled, as they were entitled in the first instance, to have a jury properly determine the question of liability and the extent of the injury by an assessment of damages. Both are questions of fact.
> * * *

> When, therefore, the trial court here found that the damages awarded by the jury were so inadequate as to entitle plaintiff to a new trial, how can it be held, with any semblance of reason, that the court, with the consent of the defendant only, may, by assessing an additional amount of damages, bring the constitutional right of plaintiff to a jury trial to an end in respect of a matter of fact which no jury has ever passed upon either explicitly or by implication? To so hold is obviously to compel the plaintiff to forego his constitutional right to the verdict made by a jury which has acted improperly, and partly by a tribunal which has no power to assess.

293 U.S. at 486–87, 55 S.Ct. at 301. The same reasoning, in the abridged version above, would apply to remittitur.

Justice Stone's dissent makes several points and, in this Court's opinion, gets the better of the argument, albeit in a somewhat disjointed fashion. First, he noted the traditional undisputed power of a trial court to set aside the verdict of the jury because it is inadequate or excessive, a power which implicitly grants the trial court the power "to determine as a matter of law, the upper and lower limits" of a verdict. *Id.* at 488, 55 S.Ct. at 302. This threshold power of the court is what defines the limits of the common law role of the jury and the constitutional right to trial by jury in a civil case.[1]

Second, the Seventh Amendment is "no bar to the adoption of [several] novel methods of dealing with the verdict of a jury, for they left unimpaired the function of the jury to decide issues of fact...." *Id.* at ·492, 55 S.Ct. at 303. Denial of the motion for new trial after consent to remittitur was not an encroachment on the province of the jury "because the exercise of the judge's discretion was affected by his knowledge that a proper recovery had been assured the plaintiff by the consent of the defendant." *Id.*

Third, although at times Justice Stone seemed apologetic about the historic argument ("scant record," "fragmentary," "legal scrap heap of a century and a half ago," *id.* at 495, 55 S.Ct. at 304–05), he clearly made it. The reason the majority had accepted remittitur was an 1822 opinion by Justice Story on Circuit, *Blunt v. Little*, Fed.Cas. No. 1,578, 3 Mason 102, which, in over one hundred years, had never been questioned in the United States Supreme Court and federal courts. The majority had conceded, without citation, that the federal practice of remittitur could rest "upon the practice of some of

the English judges" and could find "some support in the practice of the English courts prior to the adoption of the Constitution," although it found no support in any *"reasoned* English decision." *Id.* at 474–85, 55 S.Ct. at 296–301 (emphasis added). By 1935, the leading English authority permitting remittitur was evidently *Belt v. Lawes*, L.R., 12 Q.B.D. 356, 358 (1884), which had been overruled in the House of Lords by *Watt v. Watt*, L.R. [1905] A.C. 115. Thus English law was not the best source of comfort for the dissent at the time of *Dimick*.

While Justice Stone's historic argument was largely based on the flexibility of the common law and its capacity for growth, pointing particularly to the analogous area of evidence, he also built on the concession that remittitur was available in England prior to 1791. He wrote at 293 U.S. at 496, 55 S.Ct. at 305:

> The common law is not one system when it, or some part of it, is adopted by the Judiciary Act and another if it is taken over by the Seventh Amendment. If this Court could thus, in conformity to common law, substitute a new rule for an old one because it was more consonant with modern conditions, it would seem that no violence would be done to the common law by extending the principle of the remittitur to the case where the verdict is inadequate, although the common law had made no rule on the subject in 1791; and that we could not rightly refuse to apply to either the principle of general application, that it is competent to exercise a discretionary power to grant or withhold relief in any way which is not unjust. See Belt v. Lawes, supra, 358 of L.R. 12 Q.B.D.

Fourth, Justice Stone in the dissent at 293 U.S. at 494, 55 S.Ct. at 304 made perhaps the

---

1. In this regard, it does not seem to me important to dwell on the niceties of common law procedure in England, an entirely different court structure and context, in distinguishing and describing trial and appellate roles. *See Gasperini v. Center for Humanities, Inc.,* —— U.S. ——; 116 S.Ct. 2211, 135 L.Ed.2d 659 (1996) for interesting and competing viewpoints. In our system, the trial court at least shares the power. *Burns v. Delaware Coca–Cola Bottling Co. supra; DiGioia v. Schetrompf, supra.* There may be some

uncertainty as to whether appellate review of a lower court ruling is de novo [*Storey v. Castner,* Del.Supr., 314 A.2d 187, 194 (1973)] or based on an abuse of discretion standard [*Riegel v. Aastad,* Del.Supr., 272 A.2d 715, 718 (1970)]. But the Supreme Court has intervened directly on appeal when the jury "did not understand the nature of [the litigant's] claim and the damages to which [the litigant] was entitled as a matter of law." *Mills v. Telenczak,* 345 A.2d at 426.

most important point by saying the logically obvious:

> The fact that in one case the recovery is less than the amount of the verdict, and that in the other it is greater, would seem to be without significance. For in neither does the jury return a verdict for the amount actually recovered, and in both the amount of recovery was fixed, not by the verdict, but by the consent of the party resisting the motion for a new trial.

Finding the majority reading of history unacceptable in result, he further noted at 495, 55 S.Ct. at 305 that:

> [The reasoning] may commit us to the incongruous position in which we are left by the present decision: A federal trial court may deny a motion for a new trial where the plaintiff consents to decrease the judgment to a proper amount, but it is powerless to deny the motion if its judgment is influenced by the defendant's consent to a comparable increase in the recovery.[2]

As noted above, there appears to be lacking in Delaware jurisprudence any reported opinion, counter to *Dimick*, which sets forth reasons why the existing practice of remittitur or additur in Delaware law are not violative of Delaware Constitutional guarantees of jury trial under our four successive Constitutions. Our first Constitution, the Constitution of 1776, kept in force the common law of England (ART. 25) and in its companion Declaration of Rights provided "[t]hat trial by jury of facts where they arise is one of the greatest securities of the lives, liberties and estates of the people" (SEC. 13). Successive Constitutions of 1792, 1831, and 1897 have preserved "[t]rial by jury ... as heretofore." DEL. CONST. OF 1792, ART. I, SEC. 4; DEL. CONST. OF 1831, ART. I, SEC. 4; DEL. CONST. OF 1897, ART. I, SEC. 4.

In the absence of any present knowledge or reasoned opinion, I am forced to speculate on why Delaware adopted the doctrine of remittitur without considering the constitutional guarantee to a jury trial. Wooley notes an early case may have suggested

there could be no new trial in torts for excessive damages, citing *Fuld v. Thompson,* Common Pleas, 1795, Bayard's Notes. Remittitur evidently came into play gradually, first for adjustments of accounts, *Burton's Executor v. Warrington,* Del.Super., 1 Houst. 148 (1855), and later for general torts, now denominated as negligence, *Benson v. Mayor and Council of Wilmington,* Del.Super., 32 A. 1047 (1893) and *Winkler v. Philadelphia and Reading Railway Co.,* Del.Super., 4 Penn. 80, 87–88, 53 A. 90 (1902) (relevant portion of opinion in official report only), *aff'd,* Del.Supr., 56 A. 112 (1903). The remittitur history comes earlier but it is similar to the later history of the development of additur. In the broader area of simply granting a new trial for excessive damages, reliance seems to have been placed on court decisions generally from various jurisdictions. *See Winkler v. Philadelphia and Reading Railway Co.,* 4 Penn. at 88. One can speculate that Delaware merely followed the general trend of the law as it had been led by Justice Story in the case of *Blunt v. Little, supra.* The basic constitutional issue is the same under the National and State Constitutions, although the crucial year for the State is 1776, not 1791. There would also be a possible question in state law whether any precedents from the colonial period could make a common law contribution.

As ultimately with the majority in the *Dimick* decision, as distinct from their preferred opinion, it seems late in the game for Delaware to resolve the quality of the English precedents for remittitur up to July 4, 1776. Both opinions in *Dimick* recognized that there were such precedents and our use of remittitur over the years *might* be said to necessarily assume such precedents. Moreover, such precedents do in fact exist before 1776. Indeed, the *Dimick* majority, relying on SAYER, THE LAW OF DAMAGES, CH. XVIII, 173–193 (1770) said "the power of *increasing or abridging* damages assessed by the jury 'has not for many years been exercised by courts in any action except in an action for a corporal hurt;' by which [Sayer] means, as

---

**2.** It is interesting to note that this language is quoted by Justice Ginzburg in *Gasperini v. Center for Humanities, Inc.,* —— U.S. at ——, n. 16, 116 S.Ct. at 2222, n. 16. She pointedly introduced the footnote: "Inviting rethinking of the additur question on a later day, Justice Stone...."

appears along, in cases of mayhem." *Dimick*, 293 U.S. at 480, 55 S.Ct. at 298 (emphasis added). This would suggest there was English precedent which could support an additur and remittitur concept, as well as direct remittitur precedent, although neither opinion in *Dimick* appeared to rely on there being any direct precedent in favor of additur as such. If one peruses Chapter XXVIII of SAYER, one finds cases where verdicts were both increased and decreased at common law without resort to remittitur or additur.[3] There is concern in some of the cases that the Court not interfere when "the Court could not come to a certain knowledge of the Damage which had been sustained." *Id.* at 178. But, even in that situation, voluntary remittitur by the plaintiff was relied upon in one case—"the Court may stay Judgment; until the plaintiff does by entering a *Remittitur* as to part reduce the Damages to a reasonable sum." *Id.* at 180 (emphasis added). These cases were chiefly trespass cases involving property damage or actions on the case for words. The common law Courts seemed to have no problem increasing a verdict in the case of mayhem, which, in most cases, appeared to be a clearly "set out" assault and battery with ascertainable physical harm, loss of a body member, observable by the Court. *Id.* at 182–192. In one case, where the hurt did not arise to mayhem, "the sight of the Eye not being entirely lost," the damages were nonetheless increased. *Id.* At 190.

This Court comes away from this perusal with a different impression, or at least a different spin, than Justice Sutherland did in *Dimick*. The Court's impression is common

law courts frequently increased or decreased verdicts in cases of personal injury, usually but not always involving a loss of body member, but that there was a hesitancy to interfere in claims for unliquidated damages where the injury was to property or for slander. It should be noted that a view of the mayhem injury by the Court appears to be sufficient to have given certain knowledge of the damage, even though in our terms the damages would be unliquidated. *See also Schiedt v. Dimick*, dissenting opinion of Judge Morton, 70 F.2d at 564, citing BULLER'S NISI PRIUS (7th ed. 1871), p. 21(a) and an earlier 1772 edition as listing cases wherein damages in tort cases as found by a jury were increased at common law.[4]

If verdicts were judicially increased and decreased at common law, an even more extreme action than remittitur and additur, and if remittitur was expressly used, it seems to this Court that Delaware should properly conclude that the power of the Court to grant remittitur and additur is clearly supported by the common law experience. There would remain, of course, the question of discretionary exercise. But, in an appropriate case, the power can be usefully exercised. As a matter of policy, even opponents have admitted outlawing the practices "[runs] counter ... to practical convenience in doing substantial justice and saving expense." *Schiedt v. Dimick*, 70 F.2d at 564 (paraphrasing Lord Davy in *Watt v. Watt*, L.R. [1905] A.C. 115, 122). Given precedent supporting both remittitur and additur conceptually before July 4, 1776, there would appear to be no constitutional issue.

---

3. Appreciation is expressed to the Delaware Federal District Court Law Library for locating and the Villanova University School of Law Library for supplying copies of the available pages of Chapter XXVIII, pages 176 and 177 being missing.

4. This Court has assumed there is neither remittitur nor additur precedent in colonial Delaware jurisprudence. This assumption, given the early English precedent, could conceivably prove to be wrong if the unreported colonial court records were searched. Compare the assumption that there were no separate maintenance cases in equity in colonial times—*duPont v. duPont*, Del. Supr., 85 A.2d 724, 733 (1951)—with later found

evidence that there were many such cases. William T. Quillen, *Equity Jurisdiction in Delaware Before 1792*, 3 DEL.LAWYER 18 (1984). Of course, it is also possible there may be hidden cases prohibiting the practices of additur and remittitur. It seems clear to me that our colonial precedent would be properly included as part of the "common law of England." DEL. CONST. OF 1776, ART. 25. In the early English period, approximately 1676–1700, the judges, after a jury verdict at law, would often sit "in equity" and rehear the case nonjury, the role of equity then being control and review. Quillen, 3 DEL.LAWYER at 21–23. *See also* DUDLEY C. LUNT, TALES OF THE DELAWARE BENCH AND BAR 69–70 (1963).

If one ignores conceptual roles for the Court and accepts only remittitur precedent as existing at common law as of 1776, given remittitur now as an existing practice of long standing in Delaware (and the federal courts as well), the question becomes solely whether the recent innovation of additur violates the Delaware guarantee of jury trial if that issue were given a fresh look. This question is the *Dimick* question.

It seems to the Court that the starting point is abstract reason. There is no reasoned basis to distinguish remittitur from additur as a matter of simple logic. The metaphysical rationale of Justice Sutherland—however buttressed by other authority—was, is, and remains artificial and unpersuasive. In both additur and remittitur, the Court has ruled as a prerequisite that the verdict amount is legally improper and cannot be made legally acceptable unless raised or lowered. The concepts are mirror images of each other and they should, as a matter of logic, stand or fall together. On this point of debate, the dissenting opinion of Justice Stone necessarily prevails. *Dimick*, 293 U.S. at 494, 55 S.Ct. at 304.

Second, permitting additur does not change the basic decision role of the jury or the supervisory role of the judge. Again, the dissent of Justice Stone properly noted that when a judge grants a new trial he determines the verdict of a jury is legally inadequate or excessive and there is implicit in that decision the "power to determine, as a matter of law, the upper and lower limits within which recovery by a plaintiff will be permitted...." *Id.* at 488, 55 S.Ct. at 302. This is the level of abstraction at which the legal principle set forth at common law should be gleaned; this is the level where the common law distinguishes the role of the trial judge from the role of the jury, the question of law from the question of fact. Remittitur and additur do not change the dividing line; they merely make available procedural tools respectful of the delineation. Thus, adoption of remittitur and additur would not depend on the necessity of precedent of either by 1776. *Compare Severns v. Wilmington Medical Ctr.*, Del.Supr., 421 A.2d 1334 (1980). Moreover, this approach obviously makes practical sense retroactively in a jurisdiction like Delaware, which embraced remittitur sometime after 1776 (at least on current evidence).

I conclude that neither remittitur nor additur violates Delaware's right to a jury trial. There is credible evidence that precedent supporting both concepts existed at English common law and Delaware is free to recognize the Court's power to grant either. Second, even if authority for neither expressly existed at common law, the common law recognized the judge's power to determine, as a matter of law, the permissible upper and lower limits of a jury verdict. The legal principle that justifies remittitur and additur thus existed and these tools can be added to the law's arsenal without violence to the right of jury trial.

Candor and respect require further tribute to the *Dimick* majority. Justice Sutherland considered both "the question of liability and the extent of the inquiry by an assessment of damages" as "questions of fact." In a common sense way, of course, they are. Not only do they seem factual, they also involve judgment calls which make them seem more factual and even less legal. Moreover, there is a qualitative difference between determining generally whether a given verdict is inadequate or excessive and determining the precise amount of inadequacy or excess, and the latter seems more factual. And it does seem strange, if either remittitur or additur is rejected, that a trial judge is not compelled to reach the same dollar conclusion after the second trial; this further discretion makes the earlier ruling seem less legal and more factual.

But the law has this fiction that factual questions become legal questions when a *reasonable* jury could not reach a given factual conclusion. The fiction is deeply embedded in motions for summary judgment, motions for directed verdict, and motions for judgments notwithstanding the verdict. Juries are foreclosed from considering a case when "there is no *genuine* issue as to any material fact and the [pretrial] moving party is entitled to a judgment as a matter of law." Superior Court Civil Rule 56(c). Juries are not permitted to make to factual findings in

favor of a party at trial if "there is no legally sufficient evidentiary basis for a reasonable jury to find for that party on that issue...." Superior Court Civil Rule 50(a). That is similar to what judges do when they grant a new trial because the verdict is excessive or inadequate. A factual determination beyond the limits of reasonable judgment is at law a question of law. This fiction or something strongly akin thereto must be confessed to uphold remittitur and additur.

The issue is not without modest analytical difficulty. A verdict in theory can be excessive or inadequate as a matter of law or as a matter of the weight of the evidence. 11 CHARLES ALAN WRIGHT, ARTHUR R. MILLER AND MARY KAY KANE, FEDERAL PRACTICE AND PROCEDURE § 2806, 1995. But our Supreme Court has strongly hinted that our State's "independent tests to pay great deference to the role of the jury" before setting aside a verdict on account of its size, as a practical matter, makes the issue largely one of law. *Storey v. Camper*, 401 A.2d at 464, n. 6. Before exercising discretion to use remittitur or additur, it would perhaps be better for a trial court to be satisfied that the verdict is excessive or inadequate as a matter of law.

■■■ It is important to note precisely the "independent tests" developed in Delaware because the tests in themselves provide security against trial court abuse in setting aside a jury verdict, prerequisite to the use of remittitur or additur. In the area of damages, where there is a wide range of reasonable judgment, the law adds superlatives to assure that jury verdicts will not lightly be disregarded by trial courts. Not only does the verdict have to be "at least against the great weight of evidence," but it must be "so grossly out of proportion ... as to shock the Court's conscience and sense of justice." *See Storey v. Camper, supra,* and cases cited therein; *see also* recent reaffirmation of principles in *Medical Ctr. of Delaware v. Lougheed,* Del.Supr., 661 A.2d 1055, 1061 (1995). Recognizing the exclusive province of the jury on damages claimed to be grossly out of proportion, "the courts will yield to the verdict of the jury where any margin for difference of opinion exists in the matter of a verdict." *Id.; Storey v. Castner,* Del.Supr.,

314 A.2d 187, 193 (1973); *Lacey v. Beck,* Del.Super., 161 A.2d 579, 581 (1960). So the jury verdict on damages has special threshold insulation by the burden imposed in Delaware to justify a new trial. There is, of course, further safeguarding discretion in the remittitur or additur decision if the threshold insulation is successfully bridged.

Finally, in assessing the remittitur or additur designated amount, tribute is still paid to the very jury whose verdict is being set aside. "[U]nder the Delaware policy to highlight the role of the jury, our practice should be [in remittitur] to grant the plaintiff every reasonable factual inference from the record and determine what the record justifies as an absolute maximum." *Stewart v. Genesco, Inc.,* Del.Supr., 406 A.2d 25, 27 (1979); *Burns v. Delaware Coca–Cola Bottling Co.,* 224 A.2d at 259. "The reasonable additur amount is to grant to defendant every reasonable factual inference and determine what verdict the record justifies as an absolute minimum." *Breeding v. Johnston,* Del.Super., C.A. No. 91C–02–195, slip op at 4, 1992 WL 148005. These have always been the proper standards, as the *Dimick* dissent discussion of "upper and lower limits" demonstrates. *See also* the former English standard on remittitur described by Brett, M.R., in *Belts v. Lawes,* L.R. 12 Q.B.D. 357:

> [T]he Court has power to refuse a new trial without the consent of the defendant, on the plaintiff's consenting to the amount of the damages being reduced to such an amount as, if it had been given by the jury, the Court would not have considered excessive.

In this fashion, the successful litigant, such as the defendant here, gets all the legitimate advantage to which she is entitled from the jury that has already deliberated. It can at least be argued the remittitur and additur procedures thus preserve the right of jury decisions better than a new trial before a second jury.

In fixing the damages, instead of directing a new trial, the Court does not usurp the providence of a jury so much as when it sets aside a verdict and directs a new trial,

which the Court always has the power to do upon proper grounds.

*Id.,* Lindley L.J. at 359.

Both remittitur and additur have been recognized in Delaware. Additur has been requested in this case. Because of *Dimick,* this Court needed to satisfy itself, before granting an additur, that our practice is not violative of the State Constitution right of jury trial. This Court, finding the dissent in *Dimick* to be more persuasive, is satisfied that our State practice is constitutionally permissible under the State Constitution.

■ It remains only to fix the amount of the additur. Lauren Carney suffered extensive and some severe lacerations to her face, four fractured teeth, a knee injury, and a large amount of bleeding. There was pain and suffering and great anxiety on the part of a thirteen year old victim. She was taken to the hospital in an ambulance. An operation by a plastic surgeon involved between 100 and 150 stitches. There was temporary nerve damage and some permanent nerve damage which makes Lauren Carney unaware of a modest drooling on occasion. Further corrective surgery may improve the appearance of the facial scaring, but the two available procedures are somewhat difficult and the precise amount of the improvement is uncertain. There was permanent tooth damage and a root canal procedure. There is no question that this accident was a riveting experience for a young girl at the threshold of her teenage years and left her with injuries of a particularly sensitive nature, some of which are permanent and probably will be with her in excess of sixty years.

Applying the standards from *Stewart v. Genesco, supra,* and *Breeding v. Johnston, supra,* this Court finds the absolute minimum award to plaintiffs should be $49,000, or three and a half times the amount awarded by the jury. If defendant agrees, by written filing, to an additur resulting in a total verdict and judgment to plaintiffs of $49,000, the Motion for New Trial will be denied as of the date of such filing and the judgment entered, without further order of the Court. Unless defendant agrees to such additur within 10 days from the date of this Order, a second trial on damages will be granted without further order of the Court. The Prothonotary is directed to make the appropriate docket entries. IT IS SO ORDERED.